**RODIME PLC, Plaintiff–Appellant,**

v.

**SEAGATE TECHNOLOGY, INC., Defendant–Cross Appellant.**

**Nos. 98–1076, 98–1112, 98–1204.**

United States Court of Appeals, Federal Circuit.

April 13, 1999.

Rehearing Denied; Suggestion for Rehearing En Banc Declined June 3, 1999.

Margaret K. Pfeiffer, Sullivan & Cromwell, of Washington, DC, argued for plaintiff-appellant. With her on the brief were Thomas R. Leuba of Washington DC and Robert A. Sacks and Steven W. Thomas, of Los Angeles, California. Also of counsel on the brief were John C. Altmiller and Douglas E. Ringel, Kenyon & Kenyon, of Washington, DC.

Karl A. Limbach, Limbach & Limbach L.L.P., of San Francisco, California, argued for defendant-cross appellant. With him on the brief were Gerald T. Sekimura, Stephen M. Everett, and Maria S. Cefalu.

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

In this patent infringement and tort action, Rodime PLC (Rodime) asserted that Seagate Technology, Inc. (Seagate) infringes U.S. Patent No. 4,638,383 (the '383 patent). Rodime further accused Seagate of tortious interference with prospective economic advantage and unfair competition. The United States District Court for the Central District of California granted Seagate's motions for summary judgment of noninfringement and for no liability under Rodime's state law causes of action. Because the district court misconstrued the asserted claims, this court vacates the judgment of noninfringement. This court also vacates the judgment of no liability under Rodime's state law claims and remands for further proceedings due to disputed issues of fact relating to the wrongfulness of Seagate's conduct. Finally, this court affirms the district court's grant of Seagate's motion to exclude evidence of Rodime's consequential business damages as irrelevant to the calculation of a reasonable royalty.

## I.

### The '383 Patent and Accused Device

The '383 patent, entitled "Micro Hard–Disk Drive System," involves computer hard-disk drives. Generally, the patent is directed to the miniaturization of hard drive technology from 5¼ inches to 3½ inches, a size particularly suited for use in portable computers, and problems incident thereto. For example, the patent addresses power consumption, vibration mounting, heat dissipation, storage capacity, and compatibility of the electrical interface with existing technology. *See* col. 2, l. 34 to col. 3, l. 3.

Disk drives store electromagnetic data on the concentric tracks of disks. While the disks spin at high speed, small electromagnets called "transducers" or "read/write heads" move near the disk surface retrieving and recording electromagnetic information on the concentric tracks. A

positioning mechanism supports the heads and moves them to the correct location for data storage or retrieval. To ensure accurate recording and retrieval, the positioning mechanism must place the head precisely and consistently at the correct storage position on a disk track.

The demand for correct positioning introduces another of the numerous problems addressed by the invention of the '383 patent. Variations in temperature can significantly affect the positioning mechanism of the disk drive. Typically, disk drives incorporate stainless steel components where strength is critical and aluminum components elsewhere to minimize overall weight. Temperature variations cause these components, constructed of different materials, to expand or contract at different rates as the disk drive heats or cools.

The different expansion rates change the locations of these parts relative to one another. For example, when the temperature of a disk drive rises during warm-up, the disk itself will expand radially outward from the hub, which causes the tracks on the disk to move in a radially outward direction. The other components of the disk drive also expand, resulting in a cumulative offset of the head from the track. Thus, this temperature-induced offset prevents the read/write head from reaching the correct position on the disk track. Without some compensation for temperature variations, the head will not find the correct track position to retrieve information.

To solve this problem, the '383 patent teaches a thermal compensation scheme. Thermal compensation accounts for different expansion and contraction rates of a disk drive's components. In the embodiment disclosed in the patent, the thermal compensation system is built into the "positioning mechanism"—the mechanism responsible for moving the heads between tracks. Specifically, the patent prescribes constructing the positioning mechanism from appropriate materials "to automatically compensate for any mispositioning between the transducer and a track caused

by thermal effects." In addition to using stainless steel and aluminum, some of the components of the positioning mechanism use a third class of materials, such as an aluminum/bronze alloy, for its thermal expansion characteristics. The components of the positioning mechanism expand by controlled amounts, causing a corrective movement of the transducer to position it at the right location within a track.

Each of the asserted independent claims (3, 5, and 8) recites a "positioning means," the interpretation of which is central to this case. In claim 3, this element reads:

positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk, said positioning means including:

two support arms each supporting one of said read/write heads with each read/write head being mounted at one end of its respective support arm;

a pivot shaft having an axis located on one side of said support arms and spaced away from said support arms;

a positioning arm to which the other ends of said support arms are attached, said positioning arm having one end thereof coupled to said pivot shaft;

a bearing assembly supporting said pivot shaft for rotational movement thereby enabling said positioning arm to be pivoted about the axis of said pivot shaft;

a stepper motor having an output drive shaft;

means for operating said stepper motor in step increments; and

a tensioned steel band coupling said drive shaft of said stepper motor to the other end of said positioning arm, said band being arranged in a pulley arrangement whereby rotational movement of said stepper motor causes pivoting of said positioning arm about said pivot shaft for moving said support arms and the read/write heads in incremental steps with each increment causing said read/write heads to move from one track

to the next adjacent track on said micro hard-disk.

Claims 5 and 8 recite an almost identical "positioning means" to each other, but somewhat different from that of claim 3:

positioning means for moving said first and second transducer means between the concentrically adjacent tracks on said micro hard-disks, said positioning means including a positioning arm disposed within the sealed housing, a pivot shaft coupled to one end of said positioning arm and supporting said positioning arm for rotational movement relative to said micro hard-disks, four support arms, each supporting one of said heads at one end and each connected to said positioning arm at its other end, a stepper motor having a shaft extending into said sealed housing and means for operating said stepper motor in step increments, each increment causing said read/write heads to move from one track to the next adjacent track on said micro hard-disks . . . .

Rodime accuses Seagate's ST157 hard drive of infringing the '383 patent. The parties do not dispute that Seagate's drive incorporates some of the thermal compensation mechanisms disclosed in the '383 patent. Specifically, Seagate's drives use materials with favorable thermal compensation properties in their positioning mechanisms. Seagate's ST157 also relies, however, on a "thermal pin" which works in conjunction with the selection of materials to provide thermal compensation. This pin within Seagate's positioning mechanism has a precise amount of stiffness. When temperature rises and the disk components begin to expand, this expansion stresses the thermal pin causing it to bend. The bending of the pin causes a corrective movement of the head to maintain it at the proper position in the track.

### Rodime's State Law Claims

The '383 patent arose out of Rodime's efforts in the early 1980's to develop a smaller hard drive than the 5¼ inch drives then in use. Rodime succeeded in developing a 3½ inch drive, the RO350, which formed the basis for the specification common to the '383 patent and its parent. By the time the '383 patent issued in 1987, other manufacturers had begun producing 3½ inch drives. Rodime initially met resistance in its efforts to license these manufacturers. Several lawsuits quickly arose in which the manufacturers challenged the validity of the '383 patent. In response, Rodime filed for reexamination so that the United States Patent and Trademark Office (PTO) could determine if the claimed subject matter was patentable over newly discovered prior art. Rodime became aware of this new prior art during its licensing negotiations and lawsuits. After amending its claims, Rodime secured a Reexamination Certificate on November 29, 1988.

Rodime then renewed its licensing efforts, this time meeting with some success. Having already granted several licenses, Rodime began negotiations with Quantum Corporation and Western Digital Corporation. Seagate, upon learning of these negotiations, contacted both companies to dissuade them from taking licenses from Rodime. In the fall of 1991, Quantum, Western Digital, and Seagate met to discuss the '383 patent and Rodime's licensing offers. Seagate told both companies that if they were sued by Rodime, Seagate would support them by filing a declaratory judgment action. Shortly thereafter, Quantum and Western Digital ended license discussions with Rodime. A similar sequence of events took place the following year with Xebec Ltd., another potential licensee of the '383 patent. Xebec initially expressed an interest in taking a license from Rodime but, after discussions with Seagate, declined to take a license.

Following its discussions with Quantum and Western Digital, Seagate also arranged meetings among hard drive manufacturers to discuss the issue of "form factor patents"—patents whose sole point of novelty is the miniaturization of a known technology (*e.g.*, a patent covering all 3½ inch hard drives). Although Seagate

called the meetings ostensibly to discuss an industry-wide concern, Seagate did not invite Rodime to attend. In Rodime's absence, Seagate asserted its belief that Rodime's patents were invalid.

The participants in the form factor meetings also discussed petitioning the government to change its policies regarding form factor patents. Two months before the first form factor meeting, Norman Talsoe, a one-time employee of Seagate, sent a letter to the Undersecretary for Technology at the Department of Commerce. The letter discussed the "form factor patent" issue, specifically mentioning Rodime's '383 patent. Mr. Talsoe, after representing that he had "left Seagate," offered his consulting services to the Undersecretary. The record shows that Seagate was still paying Mr. Talsoe salary and benefits at the time he wrote this letter. In fact, Seagate's counsel assisted in the preparation of the letter.

Participants in the form factor meetings also met with PTO officials to discuss the issue. They suggested changes to the Manual of Patent Examining Procedure to educate the "Examining Corps" about form factor patents. Seagate suggested that the PTO hire an "independent consultant" to develop an education plan, specifically recommending Mr. Talsoe for the job. At that time, Seagate still employed Mr. Talsoe as a consultant.

## Procedural History

In November 1992, Rodime filed this action against Seagate in the District Court for the Central District of California asserting infringement of claims 3, 5, 8, and 17 of the '383 patent. Rodime also asserted state law causes of action, including tortious interference with prospective economic advantage, unfair competition, and trade libel, the first two of which are on appeal to this court.

Three district court judges presided over this case: the late Hon. Richard Gadbois, Jr., followed by the Hon. Kim McLane Wardlaw, and finally the Hon. J. Spencer Letts. Seagate initially moved for summary judgment of noninfringement before Judge Gadbois who referred the matter to a special master. The special master focused his analysis solely on the "positioning means" recited in claims 3, 5, and 8. Rodime argued that this claim element does not fall within the requirements of 35 U.S.C. § 112, ¶ 6 (1994) because it recites sufficient structure to avoid strict functional claiming rules. Rodime further argued that even if the claim element falls under § 112, ¶ 6, it only recites the function of moving the heads from track to track, not the function of performing thermal compensation to position the heads within a particular track. Thus, Rodime continued, the interpreting court need not read the structure corresponding to the thermal compensation function into the claims.

The special master disagreed on both points. He proposed interpreting the disputed claim element as a means-plus-function element because the claim purportedly recited only some of the structural elements underlying the means-plus-function element. He then determined that "the positioning means must include at least some sort of thermal compensation system ... since the specification defines the positioning means as including such structure." Nevertheless, the special master recommended denying Seagate's motion for summary judgment of noninfringement with respect to the ST157 family of disk drives. Specifically, he detected unresolved questions of fact regarding equivalence between Seagate's thermal compensation system and the thermal compensation system described in the patent.

Although Judge Gadbois adopted the special master's report in its entirety, he further expounded on the question of whether the "positioning means" invokes § 112, ¶ 6. Relying on *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536, 19 USPQ2d 1367, 1369 (Fed.Cir.1991), he noted that a claim element remains subject to means-plus-function rules when the structure recited in the element tells only what

the means *does,* but not what it *is* structurally. Applying this rule, the district court decided that the claimed "positioning means" recites what the positioning means *includes* rather than what it *is.*

In due course, Judge Letts assumed responsibility for the case. Despite the earlier resolution of the matter by the special master and Judge Gadbois, Judge Letts held a Markman hearing to interpret the "positioning means" element. He decided "it was necessary to readdress [the interpretation of the positioning means] independently because that question might be dispositive of a second issue that had not been addressed: whether the equivalence issue in this case should actually go to a jury." Analyzing the positioning means under § 112, ¶ 6, he concluded that the special master and Judge Gadbois had correctly determined that the corresponding structure included structure for performing thermal compensation. He went further, however, and determined that the patent required the claimed thermal compensation function to be performed *solely* by the arrangement, geometry, and selection of materials. Under that interpretation, Seagate's drive did not literally infringe because it used additional structure, the thermal pin, to perform thermal compensation. Moreover, Judge Letts opined that the prosecution history estopped Rodime from asserting infringement under the doctrine of equivalents. Thus, he granted Seagate summary judgment that its ST157 drives did not infringe the '383 patent.

On the state law claims, the district court held that Rodime had not stated a cause of action under the requirements of *Della Penna v. Toyota Motor Sales U.S.A., Inc.,* 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (Cal.1995). The district court further held that patent laws would preempt Rodime's cause of action even if it had successfully stated an actionable claim. Rodime appeals from the district court's judgment on infringement and the state law claims.

After the district court entered judgment in Seagate's favor, Seagate moved for an evidentiary hearing to establish that this case was "exceptional," warranting an award of attorney fees. Seagate based its motion on Rodime's alleged inequitable conduct and abuse of the litigation process. The district court denied Seagate's motion for a hearing and later denied Seagate's motion for attorney fees. In its cross-appeal, Seagate asserts that the district court erred in both of these actions.

## II.

■ This court reviews a district court's grant of summary judgment by reapplying the standard applicable at the district court. *See Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In its review, this court draws all reasonable inferences in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ This court reviews the district court's evidentiary decisions under the law of the regional circuit where appeals from the district court would normally lie. *See Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1465, 45 USPQ2d 1545, 1552 (Fed.Cir.1998). The Ninth Circuit reviews such matters for abuse of discretion. *See Williams v. Hughes Helicopters, Inc.,* 806 F.2d 1387, 1392 (9th Cir. 1986). This court also reviews the district court's decision to deny attorney fees for abuse of discretion. *See Interspiro USA, Inc. v. Figgie Int'l, Inc.,* 18 F.3d 927, 933–34, 30 USPQ2d 1070, 1074 (Fed.Cir.1994).

## III.

■ Determining infringement is a two-step process. This court first construes the claims, then compares the

properly construed claims to the accused device. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc). A central issue in this case is the district court's interpretation of the "positioning means" in independent claims 3, 5, and 8. This court reviews the district court's claim construction without deference. *See Cybor*, 138 F.3d at 1456.

■ Before the district court, Rodime argued that the "positioning means" element did not invoke § 112, ¶ 6 because, although that element contains traditional "means" language, it also recites sufficient structure to take it outside the bounds of that provision. On appeal, however, Rodime appears to have conceded this threshold issue, devoting its argument instead to the function and corresponding structure implicated by the positioning means. That concession, however, does not relieve this court of its responsibility to interpret the claims as a matter of law. To interpret the claims, this court must decide the subsidiary question of whether the claim element disputed by the parties invokes § 112, ¶ 6 in the first instance. *See Personalized Media Communications, LLC v. International Trade Comm'n*, 161 F.3d 696, 702, 48 USPQ2d 1880, 1886 (Fed. Cir.1998) ("Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction and is therefore a question of law....") Only by undertaking this inquiry can this court ensure consistency in statutory application. Moreover, this court's claim interpretation affects entities beyond the parties to this case. Therefore, this court examines the district court's decision that this claim falls under § 112, ¶ 6.

■ The word "means" is "part of the classic template for functional claim elements." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427, 44 USPQ2d 1103, 1109 (Fed.Cir.1997). Accordingly, in determining whether a claim element falls within § 112, ¶ 6, this court has presumed an applicant advisedly used the word "means" to invoke the statutory mandates

for means-plus-function clauses. *See id.* Two specific rules, however, overcome this presumption. First, a claim element that uses the word "means" but recites no function corresponding to the means does not invoke § 112, ¶ 6. *See id.* at 1427. Second, even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply. *See id.* at 1427–28 ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."); *Personalized Media*, 161 F.3d at 704 ("In deciding whether [the] presumption has been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, ¶ 6."); *Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 531, 41 USPQ2d 1001, 1006 (Fed. Cir.1996) ("An element with such a detailed recitation of structure ... cannot meet the requirements of [§ 112, ¶ 6].").

In claim 3, the element at issue begins: "positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk ." Claims 5 and 8 use language nearly identical to claim 3, but with the addition of "first and second" before "transducer." Because the element uses the word "means," this court presumes that § 112, ¶ 6 applies. This court next looks to whether the element specifies a function for performing the claimed means. In making that determination, this court relies primarily on the claim language itself. *See York Prods., Inc. v. Central Tractor*, 99 F.3d 1568, 1574, 40 USPQ2d 1619, 1624 (Fed.Cir.1996).

The claim element clearly associates the function of "moving said transducer means between the concentrically adjacent tracks" with the "positioning means." The district court, however, interpreted the element to require more than movement between tracks: "In the disputed claims,

the positioning means must not only function to move the head from track to track, it must be able to record data onto a disk and retrieve that data at a later time. Accordingly, the positioning means ... must be able to *accurately* locate a track upon which information was recorded at an earlier time." (emphasis added). The district court reasoned that the positioning means could only achieve such "accuracy" with thermal compensation. Thus, according to the district court, thermal compensation must be a function of the claimed means.

■ In so construing the claims, the district court erred by importing the functions of a working device into these specific claims, rather than reading the claims for their meaning independent of any working embodiment. *See Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1278, 35 USPQ2d 1035, 1041 (Fed.Cir. 1995) ("[T]he district court erred by importing unnecessary functional limitations into the claim."); *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571, 7 USPQ2d 1057, 1064 (Fed.Cir.1988) ("Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims."). A claim need not claim every function of a working device. Rather, a claim may specify improvements in one function without claiming the entire machine with its many functions.

Based on these principles, the district court's strained interpretation of the claimed function cannot stand. · The claim language itself clearly states the function of the positioning means: to move the transducer between tracks on the hard-disk. The prepositional link "for" ties the "means" to its function. Later in the same element, the claim reiterates: "causing said read/write heads to move from one track to the next adjacent track on said micro hard disk." The claim says nothing about accurate placement of a head within a track. Nor does it mention thermal compensation in any respect.

The specification underscores the function of movement amongst tracks. It explains that the "positioning mechanism *moves* the transducer between the tracks." Col. 3, ll. 45–46 (emphasis added). Again at col. 3, ll. 53–56, the specification states that the "positioning means *moves* the transducer along an arcuate path that extends in the radial direction with respect to the disk" so that "the transducer can *move* between the innermost and outermost tracks on the disk." Col. 3, ll. 53–56 (emphasis added). These passages emphasize that the function expressly recited in claims 3, 5, and 8 is the claimed function.

To summarize, § 112, ¶ 6 presumptively applies to the "positioning means" in the asserted claims because that element employs traditional "means" language. In addition, the claim language links the means with a function, namely, moving the transducer between tracks on the hard-disk. Accordingly, to this point, the claim element would appear to fall within § 112, ¶ 6. The final step in the analysis, however, requires this court to determine whether the claim nevertheless recites sufficient structure for performing the moving function to take it outside the bounds of that provision.

Following the portion of the claim element quoted above ("positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk"), claim 3 further provides a list of the structure underlying the means: "said positioning means including: two support arms ... a pivot shaft ... a positioning arm ... a bearing assembly ... a stepper motor ... means for operating said stepper motor ... and a tensioned steel band...." The claim also recites the specific location and interconnection of each of· these structural sub-elements. The pivot shaft, for example, has "an axis located on one side of said support arms and spaced away from said support arms."

The positioning arm has attached to it "ends of said support arms" and is also "coupled to said pivot shaft." The tensioned steel band couples "said drive shaft of said stepper motor to the other end of said positioning arm." This detailed recitation of structure for performing the moving function takes this claim element out of the scope of § 112, ¶ 6.

The analysis of claims 5 and 8 proceeds similarly. Those claims recite: "positioning means for moving said first and second transducer means between the concentrically adjacent tracks on said micro harddisks, said positioning means including a positioning arm ... a pivot shaft ... four support arms ... a stepper motor ... and means for operating said stepper motor." In addition to the recited structure, these claims also recite the interconnection of the structural components and their location with respect to other elements of the claimed combination. For example, the positioning arm is "disposed within the sealed housing." The pivot shaft is "coupled to one end of said positioning arm" and supports "said positioning arm for rotational movement relative to said micro hard-disks." As with claim 3, this detailed recitation of structure for performing the moving function removes this element from the purview of § 112, ¶ 6.

In reaching the opposite conclusion, the special master seemed concerned that the claim did not recite every last detail of structure disclosed in the specification for performing the claimed moving function. This court's case law, however, does not require such an exhaustive recitation to avoid § 112, ¶ 6. Instead, the claim need only recite "sufficient" structure to perform entirely the claimed function. *See Sage*, 126 F.3d at 1427–28; *Personalized Media*, 161 F.3d at 704. Based ·on the structure disclosed in the specification for performing the moving function, these claims recite nearly all (if not all) of the structural components of the positioning mechanism. In any case, they clearly recite more than sufficient structure for moving the transducer from track to track. Moreover, this case is different from *Lai-tram*—relied on by the district court— where the claim element merely recited "some" structure that only "serve[d] to further specify the function of [the] means." 939 F.2d at 1536. Rather, in the words of *Laitram*, the structure specified in claims 3, 5, and 8 tells what the means "*is* structurally." *Id.*

The district court thus erred in interpreting the claims at issue to require the function of thermal compensation and further erred in using § 112, ¶ 6 to read the structure for performing thermal compensation into the claims. As discussed above, the "positioning means" in claims 3, 5, and 8 does not require the function of thermally compensating and recites sufficient structure to fall outside the limits of § 112, ¶ 6.

On appeal, Seagate argues that the district court correctly interpreted the "positioning means" in claims 3, 5, and 8 to include the thermal compensation function. Moreover, Seagate notes, because the claims do not contain structure for the thermal compensation function, these claims fit within the regime of § 112, ¶ 6. To strengthen this argument, Seagate points to the modifier "positioning" in "positioning means." According to Seagate, "positioning denotes placement beyond mere moving." As noted above, however, the language of claims 3, 5, and 8 do not recite a thermal compensation function at all.

Beyond their claim language, however, the context for claims 3, 5, and 8 within the patent underscores that they do not include a thermal compensation function. For example, the language of claim 11, not asserted in this litigation, supports the reading of claims 3, 5, and 8 to require only a moving function. Claim 11 recites: "positioning means for moving said transducer means between the tracks on said hard-disk, *said positioning means being formed of selected materials for compensating for any mispositioning arising from thermal effects* ...."(emphasis added). Thus, the "positioning means"

claimed in claim 11, unlike those in claims 3, 5, and 8, explicitly adds the function of "compensating for any mispositioning arising from thermal effects." In other words, the narrower claim 11 adds a thermal compensation function expressly not included in the broader claims 3, 5, and 8. Had Rodime intended or desired to claim thermal compensation as a function of the positioning means in the asserted claims, it could have done it explicitly, as in claim 11. The absence of any such explicit language, however, shows that claims 3, 5, and 8 do not include the function of thermal compensation.

Any difficulty in identifying the function performed by the claimed means apparently stems from the description of the preferred embodiment of the positioning mechanism, which has thermal compensation built into it. As the specification explains: "By appropriately selecting materials of different coefficients of thermal expansion for the various components of the positioning mechanism, it is possible to provide thermal compensation so as to ensure that the read/write heads remain on track irrespective of thermal effects." Col. 8, ll. 22–27. This passage, however, merely highlights the unremarkable fact that a particular means may perform more than one function. It does not follow, however, that the positioning means in claims 3, 5, and 8 necessarily performs both these functions. *See Velo–Bind, Inc. v. Minnesota Mining & Mfg. Co.*, 647 F.2d 965, 968–69, 211 USPQ 926, 929 (9th Cir.1981) (declining to interpret "cutting means" to include a binding function merely because the specification disclosed a *hot* knife that performed both cutting and binding). Indeed, the two functions are not inextricably intertwined. Rather, the specification associates separate structure with each separate function. The specification teaches one of ordinary skill in this art to construct and use a positioning mechanism to move the transducer heads from track to track without "appropriately selecting materials of different coefficients of thermal expansion." While such a construction would not compensate

for thermal effects, it would nevertheless operate to move the read/write heads from track to track. In other words, thermal compensation is an additional function, with separate, additional structure, included within this patent as a separate claimed feature within the broader parameters of the entire claimed invention. Each claim, however, need not carry the limitations of narrower, specific claimed features. The specification makes this distinction and supports the interpretation of this language of claims 3, 5, and 8 which recite only the function of movement between tracks.

Finally, the prosecution history of these claims also supports the express claim language. During reexamination, the examiner rejected claim 11—which specifically recites thermal compensation as a function of the positioning means—based on European Patent Application No. 0,055,568. That reference describes a thermal compensation system in a prior Rodime hard-disk. Responding to that rejection, Rodime distinguished its claimed thermal compensation structure from the prior art. The examiner, recognizing the additional function in narrower claim 11, cited no thermal compensation art against claims 3, 5, and 8, nor did Rodime raise thermal compensation at all in relation to those claims. This prosecution history accords with this interpretation of the language of the claims. The claim language does not recite any thermal compensation function in claims 3, 5, and 8 and the examiner understood that interpretation. In addition to the claim language, this prosecution history also served to notify the public of differences between the narrower functions of claim 11 and the broader functions of claims 3, 5, and 8.

In sum, claims 3, 5, and 8 do not warrant interpretation under § 112, ¶ 6 because they recite sufficient structure to perform the entire claimed function. By applying § 112, ¶ 6 to these claims, the trial court mistakenly read limitations from the specification into the claims.

Properly interpreted, the asserted claims do not require thermal compensation. Because the district court granted summary judgment of noninfringement on grounds relating only to the particular thermal compensation scheme used in Seagate's drives, this court vacates that judgment and remands for further proceedings to determine whether Seagate has infringed the claims.

## IV.

### State Law Claims

Rodime also appeals from the district court's grant of summary judgment that Seagate is not liable for tortious interference with Rodime's prospective economic advantage or for unfair competition. The district court held that Rodime did not allege facts sufficient to state a cause of action under *Della Penna* and, even if the facts were sufficient, the patent laws preempted Rodime's claims.

As a preliminary matter, the patent laws do not preempt Rodime's state law claims. Rodime based its claims on Seagate's alleged efforts to dissuade other disk drive companies from taking a license from Rodime. The patent laws will not preempt such claims if they include additional elements not found in the federal patent law cause of action and if they are not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law. *See Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473, 46 USPQ2d 1120, 1123 (Fed.Cir.1998). Seagate alleges that Rodime's causes of action implicate the patent law cause of action of inducement to infringe.

To the contrary, the elements of proof for inducement are markedly different from those for tortious interference and unfair competition. Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent. *See Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668, 7 USPQ2d 1097, 1103 (Fed. Cir.1988). Tortious interference, in contrast, requires proof that the defendant intentionally engaged in acts wrongful by some measure other than the fact of the interference itself which are designed to disrupt an economic relationship between the plaintiff and another. *See Della Penna*, 45 Cal.Rptr.2d 436, 902 P.2d at 743 n. 1, 751. Inducement requires no proof that the acts underlying the inducement are "wrongful" by some measure other than the fact of the inducement itself.

As to unfair competition, Rodime must prove that Seagate engaged in an unfair business practice, that is, a business practice that is immoral, unethical, oppressive, unscrupulous, or substantially injurious. *See People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal.App.3d 509, 206 Cal.Rptr. 164, 177 (Cal.Ct.App.1984). Inducement, in contrast, requires no such proof that the alleged infringer's business practice is immoral, oppressive, or the like.

Thus, these state law causes of action require proof of additional elements not found in the patent law cause of action. Moreover, this court finds that these state law causes of action do not constitute an impermissible attempt to offer patent-like protection to subject matter addressed by federal law. Tortious interference protects business relationships. Unfair competition prevents unethical and oppressive business practices. Neither of these regimes purport to extend protection to the classes of invention protected by Title 35. *See* 35 U.S.C. § 101 (1994). Because these state law causes of action protect interests different from federal patent law, federal law does not preempt Rodime's state law claims.

The district court also held that Rodime did not state a cause of action under the requirements of *Della Penna*, which modified the elements of proof necessary to establish tortious interference with prospective economic relations. At the outset, *Della Penna* deals only with the tort of interference with prospective economic relations and is silent about the tort of unfair competition. Accordingly,

the district court erred in dismissing Rodime's unfair competition claim because it did not satisfy the requirements of *Della Penna*. As to tortious interference, *Della Penna* requires, in pertinent part, proof that a defendant intentionally engaged in wrongful acts or conduct designed to interfere with or disrupt an economic relationship between plaintiff and another. *See Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d at 743 n. 1, 751. *Della Penna* specifies that the acts or conduct must be wrongful "by some legal measure other than the fact of interference itself." *Id.* at 751. Viewing the facts most favorably to Rodime, this court finds a genuine issue of material fact in dispute, namely, whether Seagate's activities were wrongful by some legal measure other than the fact of interference itself. This dispute of material fact precludes summary judgment.

Viewed in a light most favorable to Rodime, Rodime has presented evidence showing the chain of events discussed at the outset of this opinion. This court also finds relevant Mr. Talsoe's letter to the Department of Commerce offering his consulting services in which he indicated that he had "left Seagate" even though he was still receiving salary and benefits from Seagate. Seagate's attorneys, having assisted in drafting the letter, were apparently aware of the misrepresentation, but made no attempt to correct it.

These activities suffice to establish a disputed issue of fact as to the wrongfulness of Seagate's conduct. Seagate's contacts with Rodime's potential licensees, as well as the meetings organized by Seagate, for example, give rise to an inference that Seagate's activity was anti-competitive and may have violated the antitrust laws. In addition, the misleading, if not outright false, statements made by Mr. Talsoe and Seagate to the PTO similarly raise a genuine issue of fact about the wrongfulness of Seagate's conduct. *See* 18 U.S.C. § 1001 (1994) (false representations to a government agency grounds for fine and imprisonment); 37 C.F.R. § 10.23 (1996) ("A practitioner shall not ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," including "giving false or misleading information" to the PTO).

■■■■■ Seagate contends that the *Noerr–Pennington* doctrine protects its meetings with others for the purpose of petitioning the PTO. That doctrine immunizes, under the First Amendment, solicitation of governmental action even though the sole purpose of the solicitation is to restrain competition. Seagate's contention fails for two reasons. First, *Noerr–Pennington* does not protect conduct which is otherwise unlawful. *See Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). As just noted, there is a genuine issue of fact as to whether Seagate's conduct was otherwise unlawful. Even assuming that *Noerr–Pennington* immunity applies, however, it would only protect Seagate's efforts to petition the government. Before the form factor meetings, Seagate's contacts with Rodime's potential licensees, again construed most favorably to Rodime, had nothing to do with petitioning the government.

Accordingly, this court vacates the district court's order granting summary judgment on Rodime's state law claims and remands for a trial on the merits.

## V.

### Consequential Business Damages

■■■ During the course of the litigation, Rodime elected to forego lost profits as a measure of damages in favor of reasonable royalties. As part of its reasonable royalty case, however, Rodime wished to prove certain so-called "consequential business damages." Specifically, Rodime alleges that Seagate's refusal to take a license under the '383 patent deprived Rodime of an income stream sufficient to enable it to have survived and profited as a disk-drive manufacturer, forcing it to instead declare bankruptcy. According to the report of Rodime's damages expert: "A reasonable estimate of this *additional* damage through June 1993 is in the range of $58 to

$107 million, *over and above the royalty revenues.*" (emphasis added). Seagate successfully moved to exclude this evidence because such damages are not relevant to the calculation of a reasonable royalty. Rodime appeals the exclusion.

Rodime's position has some superficial appeal. The foundation of a reasonable royalty analysis is a hypothetical negotiation between the patentee and the accused infringer at the time the infringement began. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554, 35 USPQ2d 1065, 1076–77 (Fed.Cir.1995) (en banc). The condition of Rodime's business at the time of such a hypothetical negotiation with Seagate may have affected the outcome of those negotiations. If, for example, Rodime faced imminent bankruptcy (as borne out by later events), Rodime may have factored that consideration into the royalty it sought. In that sense, Rodime's evidence would seem to be relevant to its reasonable royalty case.

Rodime, however, does not seek to inform the circumstances of the hypothetical negotiation as part of its computation of a reasonable royalty. Instead, Rodime seeks to recover additional damages—those flowing from Seagate's refusal to take a license—above and beyond a reasonable royalty. This court discerns no abuse of discretion by the district court in excluding the evidence for that purpose. The "consequential damages" Rodime seeks are merely a species of lost profits. Having elected to pursue only a reasonable royalty, Rodime cannot, in the district court's words, "bootstrap evidence of its lost profits back into the case by reference to 'reasonable royalties.'" Accordingly, this court affirms the district court's grant of Seagate's motion *in limine* to exclude evidence of Rodime's consequential business damages.

## VI.

### Attorney Fees

Seagate cross-appeals the district court's denial of its motion for attorney fees based on Rodime's alleged inequitable conduct in securing the '383 patent and on Rodime's alleged abuse of the litigation process. Seagate faults the district court for summarily denying attorney fees without entering findings as to exceptional case. Because this court vacates the district court's judgment of noninfringement, Seagate is no longer a "prevailing party" under 35 U.S.C. § 285 (1994). Accordingly, Seagate is not entitled to a finding of exceptional case or to an award of attorney fees.

## VII.

For the foregoing reasons, judgment of the district court is vacated-in-part, affirmed-in-part, and remanded. This court vacates the judgment of noninfringement and the judgment of no liability for Rodime's state law claims, affirms the exclusion of Rodime's consequential business damages, and remands for further proceedings

### COSTS

Each party shall bear its own costs.

*VACATED–IN–PART, AFFIRMED–IN–PART, AND REMANDED.*